UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Lanette Rae Heitzman, | Civ. No. 12-CV-2274 (MJD/LIB) |
| Plaintiff, | |
| v. | |
| SCOTT ENGELSTAD, Gilbert Police Department, Badge #702, in his individual capacity acting under color of law as a Gilbert police officer, | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Defendant. | |

---

On November 17, 2014, the above-entitled matter came before the Honorable Michael J. Davis, Chief Judge of the United States District Court for the District of Minnesota. Presentation of evidence concluded on November 19, 2014, final arguments were heard on February 4, 2015, and the matter was taken under advisement. Attorney David Izek appeared on behalf of Plaintiff Lanette Rae Heitzman. Attorneys Pamela L. VanderWiel and Anna L. Yunker appeared on behalf of Defendant Scott Engelstad.

NOW, THEREFORE, after consideration of the evidence presented, the files and memoranda in this matter, the arguments of the parties, and the applicable law, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff Lanette Heitzman is fifty-four years old.  She grew up in Sparta, Minnesota, and attended high school in Gilbert, Minnesota through the twelfth grade.

2. In 1978, Plaintiff married Sherwin Heitzman.  In 1987, Plaintiff and her husband moved to California and in 2000, moved to Arizona.  They presently live in Arizona.

3. The Heitzman's have two children, ages 35 and 32, one of whom, James Heitzman, lives in Mountain Iron, Minnesota. The Heitzmans have six grandchildren.

4. Plaintiff has been employed by the family business, Gulbranson Excavation, which operates in Minnesota, Arizona, California and Texas. The company performs excavation for utility companies.  Her job duties include taking care of office and administrative matters.

5.  The Heitzmans have owned a lake house at 4731 Differding Point Road, Eveleth, Minnesota for over thirty years. The City of Gilbert provides police service to this area.

6.  Plaintiff's parents also own a lake house three doors down from Plaintiff's lake house. Next door to this lake house is one of Gulbranson Excavation's offices.

7.  Prior to July 19, 2012, Plaintiff and her husband routinely returned to Minnesota to enjoy their lake house.

8.  Prior to July 19, 2012, Plaintiff had never been arrested or convicted of a crime, with the exception of a seat belt violation years ago.

9.  Plaintiff has had a history of health problems including diabetes, obesity and depression. (Pl. Ex. 54.) She had gastric bypass surgery in 2008. For the six months before July 19, 2012, she was feeling the best she ever had been for years. Plaintiff was enjoying camping, hunting, cooking, raising her dogs, house maintenance, babysitting her grandchildren and nieces, horseback riding and socializing with friends. She was generally happy.

10. On July 19, 2012, Plaintiff was mowing her lawn at her lake home on Differding Point Road. (Pl. Exs. 25-26 and 28.) She also mowed the grass at her parents' lake home and the next door office. Plaintiff also mowed the overgrown grass leading from her lake home to the Gilbert Beach. (Pl. Exs. 27, 29, 32, 33, 34, and 35.)

11. The Gilbert Beach and its entrance are located along Differding Point Road.

12. Plaintiff used a riding mower to cut the grass. (Pl. Ex. 24.) The riding mower's attachment was not working, so the grass clippings were not collected while she mowed.

13. Plaintiff mowed a path leading from her lake house to the beach area so children would not have to walk on the roadway in getting to the lake and beach. As she mowed, grass clippings were left on the roadway.

14. Catherine Leece, a neighbor who has lived on Differding Point Road for approximately twenty years, saw Plaintiff mowing the grass on July 19, 2012. Leece had never met Plaintiff before and did not know who she was.

15. Leece, who was riding a bicycle, stopped to speak with Plaintiff because she was concerned about the grass clippings Plaintiff was depositing on Differding Point Road.  Approximately a week or two earlier, Leece was aware that Plaintiff's husband had mowed the grass in the public ditch and had left piles of clippings on the road.  Leece did not want the clippings left on the road again because she believed they would clog a nearby culvert and cause flooding.

16. The conversation was not cordial.  Plaintiff told Leece that she was making the property look better, and that she intended to keep mowing.  Plaintiff did not tell Leece that she intended to clean up the clippings.  Leece told Plaintiff that she was going to report the clippings to the City.

17. The grass mowing took Plaintiff approximately four hours to complete and afterward, Plaintiff was exhausted.  She is diabetic and was weak after the mowing because her sugar level was low.  She testified that when her sugar level is low, she appears weak, exhausted and tired.

18. At approximately 11:43 a.m., Leece called 911 to complain about the grass clippings Plaintiff was depositing on Differding Point Road.  Because

Leece did not know who Plaintiff was, she did not give Plaintiff's name to the 911 operator.

19. Defendant Scott Engelstad was a police officer for the City of Gilbert ("City"). Engelstad was hired by the City in October 1998, and he retired in August 2012.

20. The 911 operator sent a dispatch to the Gilbert Police Department. Chief of Police Ty Techar and Engelstad were on duty on the morning of July 19, 2012 and received the dispatch. The text of the dispatch read: "Person is 'defacing public property' with a lawn mower." The dispatch did not identify Plaintiff as the subject of the complaint. The dispatch identified the location as Sparta Beach, rather than the cabin's address.

21. Engelstad took the call. As he drove down Differding Point Road toward Sparta Beach, he noticed a long row of grass clippings lining both sides of the road.

22. As he approached 4731 Differding Point Road, Engelstad saw a woman sitting on the steps of a cabin on the property. The woman sitting on the steps was Plaintiff.

23. At that time, Plaintiff was talking on her cell phone to her mother, telling her about Plaintiff's interaction with Leece, and that she expected that Leece was going to complain to the City.

24. When Engelstad saw Plaintiff, he called the complainant to get a description of the subject of the complaint. The description provided by Leece matched the description of the woman sitting on the steps.

25. Plaintiff saw Engelstad drive by her home, and stated to her mother, "You won't believe this Ma, but the police are here." Plaintiff walked to the side of the road and waited for the police car to come back.

26. Engelstad, having confirmed that the woman on the steps matched the description of the subject of the complaint, turned and drove back to the cabin. He pulled up alongside Plaintiff.

27. After parking, Engelstad exited his squad car. Plaintiff and Engelstad had never met one another before. Neither recognized the other.

28. Plaintiff testified that as soon as Engelstad got out of his squad car, he yelled at Plaintiff that "she couldn't mow the grass there." Engelstad

testified that as soon as he got out of his squad car, Plaintiff was the first to speak and said, "Really? I can't mow on my own property?"

29. After a short exchange, Plaintiff told Engelstad she did not like his tone and asked for his name. Engelstad responded loudly enough that Plaintiff's mother heard him over the phone. Plaintiff then stated to Engelstad that she wanted to see his supervisor. Engelstad called his supervisor, Chief Techar and asked him to come to the scene. Engelstad did not specifically ask Plaintiff whether she was responsible for the grass clippings in the road.

30. Engelstad testified that it was his intention, upon arriving at the scene, to tell Plaintiff to clean up the clippings and the matter would be resolved. Once Plaintiff asked for his supervisor, however, Engelstad planned to wait until Techar arrived before engaging with Plaintiff any further.

31. After Engelstad called Techar and told Plaintiff that Techar was on his way, Plaintiff said that she would wait inside the cabin. Engelstad told Plaintiff that she needed to stand by the car until Techar arrived. Plaintiff repeated that she was going to wait in the cabin and began to walk away,

toward the cabin. Engelstad then threw his notebook to the ground near his feet and said, "Damn it, lady, I told you, you need to stay by the squad." Plaintiff testified at that point, Engelstad's demeanor changed drastically and she began to cry.

32. Plaintiff continued to walk toward the cabin. Engelstad followed, telling her several times that she needed to stop and return to the squad car.

33. When Plaintiff reached the steps to the cabin, Engelstad took her by the right elbow and told her she was under arrest. Plaintiff testified that she did not resist Engelstad, but that he nonetheless spun her around several times and then slammed the left side of her face down on the hood of a family car that was parked in her driveway.

34. Plaintiff was still on the telephone with her mother. She told her mother that she was under arrest and that her mother should call 911. Plaintiff's mother, Loretta Gulbranson, did call 911 and told the dispatcher Engelstad has a conflict and a personal vendetta against Plaintiff and her family.

35. Engelstad then forcefully pushed on Plaintiff's neck and back with his arm to hold her down to handcuff her wrists behind her back.

36. After putting Plaintiff in handcuffs, Engelstad escorted her to his squad car and she was placed in the back seat of the squad.

37. Shortly thereafter, Chief Techar arrived, followed by Plaintiff's cousin, Lonnie Gulbranson, and her husband Sherwin Heitzman. One of the Heitzman's granddaughters had called Sherwin to let him know that "Nana" was handcuffed and in the back of a police car.

38. Chief Techar spoke briefly to Plaintiff. Plaintiff mentioned that it was hot in the car, and Techar turned the air conditioning up.

39. When Sherwin Heitzman arrived at the lake home, he briefly spoke with Engelstad. Engelstad introduced himself and gave Heitzman the background as to why he was at their home, and that he had an altercation with Plaintiff. Engelstad also told Heitzman that he did not learn who Plaintiff was until after she was arrested.

40. Plaintiff's husband also talked to Plaintiff while she was in the squad car. Plaintiff complained that her handcuffs were too tight. Her husband relayed this message to Engelstad, and Engelstad loosened the handcuffs.

41. Plaintiff admitted at trial that at no time during the handcuffing did she indicate that Engelstad was hurting her or that she was unusually susceptible to injury.

42. Plaintiff also admitted at trial that she spoke with Chief Techar, Sherwin Heitzman, and Lonnie Gulbranson, but she did not tell any of them that Engelstad had slammed her against a car or shoved her face into the hood. With the exception of saying that her handcuffs were hurting her, Plaintiff did not complain of any pain or injuries.

43. Jailor Chelsea Trucano saw Plaintiff approximately half an hour later, but did not observe any injuries. Later that night, Plaintiff went to St. Luke's Hospital, where she was treated for an infection. Though medical records indicate that Plaintiff reported having been handcuffed, there is no mention that Plaintiff had any observable bruising or complained about being injured.

44. The report from St. Luke's Hospital also indicates that Plaintiff said that she was handcuffed and sat in a hot car for a long time, but there is no report that she complained of being treated roughly in any way.

45. Although it is undisputed that prior to the arrest, Plaintiff and Engelstad had never met, they knew of each other. Engelstad is currently married to Rosalyn Engelstad, who was formerly married to Plaintiff's brother. There is an ongoing child support dispute between Rosalyn Engelstad and Plaintiff's brother.

46. Engelstad also knows Plaintiff's son, James Heitzman. James testified at trial that he has known Engelstad since approximately 2007, and on occasion, they have socialized at the same bars and restaurants.

47. In December 2008, James Heitzman was involved in a serious motor vehicle accident involving alcohol. (Pl. Ex. 15.) He was also was involved in a serious snowmobile accident involving alcohol in February 2010. (Pl. Ex. 16.)

48. In the days following his snowmobile accident, Plaintiff made numerous calls to 911 requesting that Engelstad leave her son James Heitzman's house because she believed that Engelstad was a bad influence on her son's drinking behavior. (Pl. Exs. 13 and 14.)

49.  On February 14, 2010, Plaintiff called the Gilbert Police Department and requested a welfare check on her son. (Pl. Ex. 17.) She also requested that Engelstad not perform the welfare check because "she has an issue with Officer Engelstad." (*Id.*) Unbeknownst to Plaintiff, when she made that call she was actually talking with Engelstad.

50.  Engelstad had on a prior occasion advised James Heitzman how to get around a driving under the influence charge by drinking in excess after the driving conduct.

## CONCLUSIONS OF LAW

On June 25, 2014, the Court issued an Order granting in part Defendants' motion for summary judgment. (June 25, 2014 Order at 29-30 [Doc. No. 97].) Among the claims that were dismissed were Plaintiff's false arrest claims. Following that Order, the only claims that remained for trial are Plaintiff's excessive force, battery, and negligence claims against Engelstad. The remaining issues before the Court are: (1) whether Engelstad used excessive force to arrest

Plaintiff; (2) whether Engelstad committed a battery when he arrested Plaintiff; and (3) whether Engelstad was negligent when he used force to arrest Plaintiff.

Based on the Court's factual findings, the Court finds that Engelstad is entitled to judgment in his favor because, as a matter of law, he is entitled to qualified immunity with respect to Plaintiff's claim of excessive force and official immunity with respect to the state law claims of battery and negligence.

## I. ENGELSTAD IS ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is an affirmative defense that "shields a government official from liability and the burdens of litigation in a § 1983 action for damages unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable official would have known." *Chambers v. Pennycook*, 641 F.3d 898, 904 (8th Cir. 2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). Rather, "existing

precedent must have placed the statutory or constitutional question . . . beyond debate." *Id.*

Officers may conduct an investigatory *Terry* stop when, based on the totality of the circumstances, they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981).  Here, Engelstad had a particularized and objective basis for stopping Plaintiff about the grass clippings in the road.  As such, Plaintiff was not free to leave until the stop had ended.  *See United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  When Plaintiff refused Engelstad's order to stay by the car, it was reasonable for Engelstad to use some force to detain Plaintiff.  The only question before the Court is whether the amount of force used by Engelstad was excessive.

The parties do not dispute that Engelstad ordered Plaintiff to remain by his squad car while they waited for Chief Techar to arrive at the scene.  The parties also do not dispute that Plaintiff refused to obey Engelstad's order and that Engelstad thereafter grabbed Plaintiff's arm, led her towards a car in the driveway, and pushed her over the hood in order to place handcuffs on her

wrists. The evidence further established that Plaintiff suffered some bruising on her wrists from being handcuffed, and that she suffered a bruise on her face, which is consistent with Plaintiff's claim that she was forcefully pushed onto the hood of the car in order to be handcuffed, and that the handcuffs were tight on her wrists.

Based on these facts, the Court finds that the applicable case law fails to uncover any authority that placed the issue of the lawfulness of Engelstad's actions beyond debate. *See, e.g.*, *Blazek v. City of Iowa City*, 761 F.3d 920, 923-25 (8th Cir. 2014) (holding that an officer was entitled to qualified immunity when the officer "grabbed [plaintiff's] arm, twisted it upward and behind [plaintiff's] back, and then threw [plaintiff] to the floor" in the course of applying handcuffs because this is "a relatively common and ordinarily accepted non-excessive way to detain an arrestee").

Further, there is no robust consensus of persuasive authority that would put one on notice that Engelstad's actions were unlawful. To the contrary, in *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000), the Eleventh Circuit Federal Court of Appeals opined that an even greater use of force on a non-fleeing and non-

resisting arrestee was reasonable and that the force and injury alleged "sounded little different from the minimal amount of force and injury involved in a typical arrest." *Id.* at 1258 n.4.

For these reasons, the Court finds that Engelstad is entitled to qualified immunity with respect to Plaintiff's claim under Section 1983.

## II.   ENGELSTAD IS ENTITLED TO OFFICIAL IMMUNITY.

Engelstad is also entitled to official immunity from Plaintiff's battery and negligence claims.  Government officials are entitled to official immunity from state law claims when "the official's duties require the exercise of discretion or judgment." *Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001).  Official immunity exists "to protect public officials from the fear of personal liability that might deter independent action." *Pletan v. Gaines*, 494 N.W.2d 38, 41 (Minn. 1992).  A public official only loses this protection if he or she "commits a willful or malicious wrong." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 677 (Minn. 1988).

### A.     Engelstad's actions were discretionary.

Generally, a peace officer's duties are considered to be discretionary and, therefore, covered by official immunity.  *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 (1999); *see also Stepnes v. Ritschel*, 771 F. Supp. 2d 1019, 1042 (D. Minn. 2011).  During his interaction with Plaintiff, Engelstad used his professional, discretionary judgment in deciding whether to arrest Plaintiff and how to take her into custody.  Engelstad had to consider the facts he was presented with and evaluate whether he had probable cause to arrest her and the amount of force needed to place her in handcuffs.  These decisions are discretionary.

### B.     Engelstad's actions were not willful or malicious.

In the context of official immunity, "[m]alice is defined as 'the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" *Dokman*, 637 N.W.2d at 296 (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991)).  An act is not considered willful or malicious unless the public official "intentionally commits an act that he or she then has reason to believe is prohibited." *Id.*

None of Engelstad's actions can be classified as willful or malicious. Engelstad did not use excessive force to put Plaintiff in handcuffs and take her into custody.  Engelstad had no reason to believe that handcuffing Plaintiff in the manner he did was unlawful or violated Plaintiff's rights.

Plaintiff's allegation that Engelstad arrested her in retaliation for her family's involvement in a dispute with Engelstad's wife is not supported by the evidence. There was no evidence that Engelstad knew who Plaintiff was until after she was arrested and in handcuffs.

NOW, THEREFORE, the Court herewith makes the following:

## **ORDER FOR JUDGMENT**

Judgment shall be entered in favor of Defendant Officer Scott Engelstad.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   February 5, 2015

                                        s/Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court